# In the
# United States Court of Appeals
## for the Seventh Circuit

PETER JOKICH,

*Plaintiff-Appellant,*

v.

RUSH UNIVERSITY MEDICAL CENTER,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:18-cv-07885.
The Honorable **Joan H. Lefkow**, Judge Presiding.

## BRIEF OF DEFENDANT-APPELLEE
## RUSH UNIVERSITY MEDICAL CENTER

ROISIN DUFFY-GIDEON
GEORGE F. GALLAND, JR.
MINER, BARNHILL & GALLAND P.C.
325 North LaSalle Street
Suite 350
Chicago, Illinois 60654
(312) 751-1170

*Counsel for Defendant-Appellee*

 

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-2691

Short Caption: Jokich v. Rush University Medical Center

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Rush University Medical Center

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Miner, Barnhill & Galland, P.C.

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

Rush University Medical Center is an Illinois not-for-profit corporation with no "parent corporation" but is part of a complex of corporations whose umbrella entity is the Rush University System for Health, an Illinois not-for-profit corporation

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See above. Rush University Medical Center does not have stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ George F. Galland, Jr.    Date: 09/20/21

Attorney's Printed Name: George F. Galland, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** [✔] **No** [ ]

Address: Miner, Barnhill & Galland, P.C.

325 N. LaSalle St., Ste. 350, Chicago, IL 60654

Phone Number: 312.751.1170    Fax Number: 312.751.0438

E-Mail Address: ggalland@lawmbg.com

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2691

Short Caption: Jokich v. Rush University Medical Center

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

Appearance and Disclosure Statement of Attorney Roisin Duffy-Gideon

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Rush University Medical Center

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Miner, Barnhill & Galland, P.C.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    See above.  Rush University Medical Center does not have stock.

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Roisin Duffy-Gideon          Date: 12/02/21

Attorney's Printed Name:  Roisin Lynn Duffy-Gideon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑     **No** ☐

Address:  Miner, Barnhill & Galland, P.C.

    325 N. LaSalle St., Ste. 350, Chicago, IL 60654

Phone Number: 312.751.1170          Fax Number:  312.751.0438

E-Mail Address: rduffy@lawmbg.com

rev. 12/19 AK

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................... iii

JURISDICTIONAL STATEMENT .................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................ 1

COUNTERSTATEMENT OF THE CASE ........................................... 1

    Background ................................................................. 2

    Dr. Jokich's employment agreements ....................................... 3

    The development of conflict ................................................ 7

    The removal decision ...................................................... 11

    Dr. Jokich's accusations of June 2018 ..................................... 14

    The removal ............................................................... 15

    The litigation ............................................................. 16

SUMMARY OF THE ARGUMENT ................................................. 18

ARGUMENT ...................................................................... 22

I.    THE COURT RIGHTLY REJECTED
    THE RETALIATION CLAIMS .................................................. 23

    A.    No statement made by Dr. Jokich before
        the removal decision was "protected" ............................... 23

    B.    No reasonable jury could find a causal
        link between the removal and Dr. Jokich's two
        surviving claimed instances of protected activity ............ 25

1. Rush offered overwhelming evidence of its legitimate reason for removing him ................... 26

2. No reasonable jury could find that Dr. Jokich's June 2018 statements caused his removal .............. 28

3. Dr. Jokich had no evidence to link his statement to Nelson to his removal ......................... 32

4. Dr. Jokich's "wrong causation standard" argument has no merit ........................... 34

5. Dr. Jokich's "circumstantial evidence" arguments have no merit ........................ 35

C. Dr. Jokich has no retaliation claim based on a "demotion" ............................ 42

II. THE COURT RIGHTLY REJECTED THE STATE CLAIMS ........................... 45

A. Summary judgment was required on the "2016 Letter" claim ................................. 46

1. There was no intentional implied waiver ................. 47

2. The "estoppel" theory failed ..................................... 56

B. No reasonable jury could find that putting Dr. Jokich on paid leave was a "termination" of his FEA ................................. 59

C. The court rightly granted summary judgment on the Bylaws §10.3-2(c) claim .......................... 61

CONCLUSION .................................................................... 63

CERTIFICATE OF COMPLIANCE .................................................. 64

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                 <u>Page</u>

*Allen v. Cedar Real Estate Grp.,*
236 F.3d 374 (7th Cir. 2001) ........................................................ 54

*Anderson v. Cath. Bishop of Chicago*,
759 F.3d 645 (7th Cir. 2014) ........................................................ 49

*Ballard v. Solid Platforms, Inc.*, No. 2:10 CV 238,
2012 WL 1066760 (N.D.Ind. Mar. 27, 2012) .................................. 42

*Beamon v. Hewitt Associates LLP,* No. 03 C 705,
2004 WL 2038169 (N.D.Ill. 2004) ................................................. 24

*Beanstalk Grp., Inc. v. AM Gen. Corp.*,
283 F.3d 856 (7th Cir. 2002) ........................................................ 62

*Bhatia v. Vaswani*, No. 18-CV-2387,
2020 WL 3578004 (N.D.Ill. July 1, 2020) ..................................... 46

*Candle Corp. v. Boole & Babbage, Inc.*,
1985 WL 1087794 (C.D.Cal. Aug. 2, 1985) ................................... 53

*Chatman v. Bd. of Educ. of City of Chicago,*
5 F.4th 738 (7th Cir. 2021) ........................................................... 35

*Collins v. Illinois*, 830 F.2d 692 (7th Cir. 1987) ........................... 44

*Cora v. Rancilio Macchine Per Caffe*, No. 01 C 3613,
2003 WL 21654152 (N.D.Ill. July 14, 2003) .................................. 48

*Crady v. Liberty Nat. Bank & Tr. Co. of Indiana*,
993 F.2d 132 (7th Cir. 1993) ........................................................ 43

*Dahm v. Flynn*, 60 F.3d 253 (7th Cir. 1994) .................................. 44

*Dearborn Industrial Manufacturing Co., Ltd. v.
Soudronic Finanz AG*, No. 95 C 4414, 1996 WL
467245 (N.D.Ill. Aug. 13, 1996) .................................................... 55

*Foster v. Loc. Union 8A-28A Metal Refinishers,
Painters, Sign & Display, Equip. & Auto. Painters*,
No. 16 C 4174, 2018 WL 4467118 (N.D.Ill. Sept. 17, 2018) ......... 46

*Gehring v. Case Corp.,* 43 F.3d 340 (7th Cir. 1994),
*cert. denied*, 515 U.S. 1159 (1995) ................................................. 25

*Glass v. Kemper Corp.*, 949 F.Supp. 1341
(N.D.Ill. 1997), *aff'd*, 133 F.3d 999 (7th Cir. 1998) ....................... passim

*Guaranteed Rate, Inc. v. Warren Barr*,
No. 12 C 5362, 2013 WL 2452293 (N.D.Ill. June 5, 2013) ............. 46

*Hatmaker v. Memorial Med. Ctr.,*
619 F.3d 741 (7th Cir. 2010), *cert. denied*,
562 U.S. 1270 (2011) ...................................................... 24, 25

*Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) .......................... 32

*Home Ins. Co.* v. *Cincinnati Ins. Co.*,
821 N.E.2d 269 (Ill. 2004) ............................................................ 47

*Igasaki v. Illinois Dep't of Fin. & Pro. Regul.,*
988 F.3d 948 (7th Cir. 2021) ......................................................... 33, 37

*Karazanos v. Navistar Int'l Transp. Corp.*,
948 F.2d 332 (7th Cir. 1991) ......................................................... 37

*Kelly v. U.S. E.P.A.*, 203 F.3d 519 (7th Cir. 2000) ........................ 38

*Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012),
*cert. denied*, 568 U.S. 963 (2012) ................................................. 33

*Koty v. DuPage Cty., Ill.*, 900 F.3d 515 (7th Cir. 2018) ............... 43

*Kroger v. Dart*, 950 F.3d 971 (7th Cir. 2020)................................. 32

*Lavalais v. Vill. of Melrose Park,*
734 F.3d 629 (7th Cir. 2013) ....................................................... 43

*Lavelle v. Dominick's Finer Foods, Inc. of Illinois,*
592 N.E.2d 287 (Ill. App. 1992)................................................... 47

*Lewis v. Wilkie*, 909 F.3d 858 (7th Cir. 2018) ............................... 23

*Mattson v. Caterpillar, Inc.*, 359 F.3d 885 (7th Cir. 2004)............ 25

*Munoz v. Expedited Freight Sys., Inc.,*
No. 89 C 3700, 1990 WL 114589 (N.D.Ill. July 23, 1990).............. 54

*Peele v. Country Mut. Ins. Co.,*
288 F.3d 319 (7th Cir. 2002) ....................................................... 37

*Perfetti v. First Nat'l Bk. of Chicago,*
950 F.2d 449 (7th Cir. 1991), *cert. denied,*
505 U.S. 1205 (1992) ................................................................... 39

*Porter v. City of Chi.,* 700 F.3d 944 (7th Cir. 2012) ..................... 44

*R.G. Ray Corp. v. Maynard Mfg. Co.,*
No. 92 C 3708, 1993 WL 462841 (N.D.Ill. Nov. 8, 1993) .............. 47

*Rahn v. Bd. of Trustees of N. Illinois Univ.,*
No. 09 C 3033, 2014 WL 11395169
(N.D.Ill. June 6, 2014), *aff'd*, 803 F.3d 285 (7th Cir. 2015)........... 42

*Schuster v. Lucent Technologies, Inc.,*
327 F.3d 569 (7th Cir. 2003) ....................................................... 39

*Schwinder v. Austin Bank of Chi.,*
809 N.E.2d 180 (Ill. App. 2004)................................................... 57

*Smart v. Ball State Univ.*, 89 F.3d 437 (7th Cir. 1996) ................. 43

*Sosin v. Hayes*, 630 N.E.2d 969 (Ill. App. 1994) ............................ 54

*Southwest Forest Indus., Inc. v. Sharfstein*,
482 F.2d 915 (7th Cir. 1972) ........................................................ 48

*Speedy v. Rexnord Corp.,* 243 F.3d 397 (7th Cir. 2001) ................ 23

*Sphere Drake Ins. Ltd. v. American Gen.
L. Ins. Co.*, 376 F.3d 664 (7th Cir. 2004) ...................................... passim

*Stephens v. Erickson*, 569 F.3d 779 (7th Cir. 2009) ...................... 43

*Taylor v. JP Morgan Chase Bank, N.A.*,
958 F.3d 556 (7th Cir. 2020) ........................................................ 54

*Traylor v. Brown,* 295 F.3d 783 (7th Cir. 2002) ............................ 43

*U.S. v. Harris*, 914 F.2d 927 (7th Cir. 1990) ................................. 52

*U.S. v. Sanders*, 979 F.2d 87 (7th Cir. 1992),
*cert. denied*, 508 U.S. 920 (1993) .................................................. 52, 53

*Watson v. Champion Computer Corp.*, No. 99 C 1639,
2000 WL 1741882 (N.D.Ill. Nov. 22, 2000) ................................... 55, 56

*Weihaupt v. Am. Med. Assoc.,* 874 F.2d 419 (7th Cir. 1989) ......... 36

*Whalen v. K-Mart Corp.*, 519 N.E.2d 991 (Ill. App. 1988) ............ 54

*Wikoff v. Vanderveld*, 897 F.2d 232 (7th Cir. 1990) ...................... 47

## STATUTES

735 ILCS 5/2-1009 ........................................................................ 17

# OTHER AUTHORITIES

Northern District of Illinois, Local Rule 56.1 ............................... 28, 41

Restatement (Third) of Agency §3.03 (2006) ................................. 59

## JURISDICTIONAL STATEMENT

Dr. Jokich's jurisdictional statement is complete and correct.

## ISSUES PRESENTED FOR REVIEW

(1)  Could a reasonable jury find that Dr. Jokich engaged in any "protected activity" under Title VII or the ADEA that caused Rush to remove him?

(2)  Could a reasonable jury find that Rush impliedly waived, or is estopped from enforcing, the condition precedent of Board approval of a proposed 2016 Letter Agreement?

(3)  Could a reasonable jury find that Rush terminated Dr. Jokich's Faculty Employment Agreement in mid-term?

(4)  Did Dr. Jokich's removal violate a Medical Staff Bylaw providing that he served at the discretion of his Department Chair, where the top Rush executives who supervised that Chair approved the removal decision and the Chair never objected?

## COUNTERSTATEMENT OF THE CASE

A Counterstatement is necessary, since Dr. Jokich omits most of the facts that led to summary judgment.  In what follows, **D.E.** means the district court's docket entry number.  **PB** means Dr. Jokich's

opening brief.  **App.** means that brief's Short Appendix.  **PX** and **DX**

refer to Plaintiff's and Defendant's Exhibits, found at D.E. 150 and 136

respectively.  **PR** means Plaintiff's Local Rule 56.1(b)(3) Response (D.E.

149).  The myriad evasions in that Response, which the district court

denounced (App. 2-3), have required this brief to give detailed record

citations for dozens of undisputed facts.

## Background

Rush University Medical Center is a not-for-profit corporation

whose governing Board of Trustees functions through standing

committees, including a Compensation Committee.  PR ¶¶2, 8; DX 2,

246:24; DX 4, 85:18-86:1.  In 2017-2018, Rush's top managers included

its CEO, Larry Goodman, M.D., who reported to the Board; its COO,

Michael Dandorph; and its Dean, Dr. Ranga Krishnan.  The latter two

reported to Dr. Goodman.  PR ¶2.

Rush employed Dr. Jokich in 2001 to head its mammography unit.

As of 2017-2018 he was Director of the Division of Breast Imaging, a

leadership-level position.  PR ¶1, 32; DX 2, 143:22-144:15.  In Rush's

"matrix" organization, managers may report to more than one person.

DX 2, 66:11-17.  The Breast Imaging Division was in the Department of

Radiology, whose Chair as of 2017-18 was Dr. Sharon Byrd. The Division also functioned within the cross-departmental Rush Cancer Center, whose Acting Director in 2017-2018 was Dr. Robert DeCresce. PR ¶2, ¶131. Dr. Byrd annually evaluated Dr. Jokich. *Id.,* ¶131. Otherwise, she had no regular contact with him or his Division physicians. She testified, "[I]t was not like I was really overseeing and people were talking to me about what was going on in the breast imaging." DX 9, 161:4-16. She viewed him as reporting to Dr. DeCresce and to Dr. Krishnan, to whom she and Dr. DeCresce reported. *Id.,* 24:24-25:21, 36:18-23, 63:3-7, 137:4-7.

## Dr. Jokich's employment agreements

Dr. Jokich and Rush had a Faculty Employment Agreement (FEA), whose one-year term renewed each July 1 unless either party gave 120-days' prior written notice. DX 63. Termination of the FEA during a term required specified cause, but nonrenewal on expiration of a term required none. *Id.,* pp. B-4-5. Section 7 of his FEA allowed Rush to modify his duties or salary at any time on 60-days' notice; he could terminate the FEA if he disagreed about the change. *Id.,* p. 1.

Because the FEA assured only a one-year term, he negotiated additional agreements with Rush giving him multi-year terms. These "letter agreements" also gave him a bonus opportunity, and provided for fringe benefits greater than Rush's standard package. PR ¶6; DX 65, 67, 68. From 2007 forward, each such agreement also provided that Rush would extend the bonus opportunity and enhanced fringes to his Division physicians. PR ¶33.

Anti-kickback laws with treble-damage penalties limit Rush to paying "fair market value" (FMV) to employed physicians. PR ¶8. The Board's Compensation Committee, advised by the consulting firm Sullivan Cotter, reviews proposed high-paying contracts to assure compliance with this limit. In 2013, the Committee approved a three-year letter agreement for Dr. Jokich, even though Sullivan Cotter advised that Dr. Jokich's compensation exceeded the 95th percentile while his productivity was below the 10th. PR ¶13; DX 68. Dr. Jokich then demanded yet more money, but relented and signed on January 24, 2014. PR ¶32; DX 68. During his holdout, Rush advised him his FEA was his only employment contract. DX 68, p. 1. Nothing in his

FEA required a bonus or enhanced benefits, but Rush paid them during this period to him and his Division physicians. DX 101; PR ¶34.

In August 2016, to replace the letter agreement that had expired June 30, Dr. Krishnan and Dr. Jokich signed a four-year agreement (the "2016 Letter") which stated it would require Committee approval. DX 77. Sullivan Cotter advised the Committee that Dr. Jokich's proposed compensation approximated the 90th percentile while his productivity remained below the 10th. DX 14, 44:15-45:4, 54:23-55:18.

On October 21, 2016, the Committee refused to approve the 2016 Letter. DX 78. It instructed management to develop a productivity metric for Dr. Jokich and to submit it for Committee approval in 2017. DX 11, 41:22-43:13; DX 70, 78; DX 12, 52:18-53:1, 53:10-21. The Board never reconsidered this rejection, and no one told Dr. Jokich it did. DX 2, 246:11-20; DX 4, 155:11-156:5. The Committee's disapproval of the 2016 Letter did not affect Dr. Jokich's Faculty Employment Agreement, which remained in effect. PR ¶6.

Dr. Krishnan asked Dr. Antonio Bianco, President of Rush's employed-physician practice group, to negotiate an amended letter agreement with Dr. Jokich. DX 12, 9:22-10:8, 11:5-7; DX 79-81. In

early March 2017, knowing Dr. Jokich opposed measuring productivity by RVUs, Dr. Bianco proposed a non-RVU metric.  DX 83.  In the ensuing negotiation, Dr. Jokich acknowledged the Committee would have to approve any agreement.  DX 84-88.  On April 19, 2017, Dr. Bianco sent him a proposal which recited the Committee's rejection of the 2016 Letter, and amended it by adding a non-RVU productivity metric and a phase-out of enhanced fringe benefits.  DX 90, 91.  On April 21, 2017, Dr. Jokich rejected the amendment, calling it "insulting and disrespectful."  DX 21; DX 4, 141:17-143:11.

Management then revised the proposed amendment, easing the productivity target and preserving the enhanced fringes.  PR ¶¶26, 27.  On June 26, 2017, the Committee approved this revised amendment, which again recited the Committee's earlier rejection of the 2016 Letter.  *Id.;* DX 94.  The Dean's Office emailed Dr. Jokich the amendment to sign and return.  *Id.*  He did not sign or return it, because he saw it as "basically the same letter that [he] had earlier said [he] wouldn't sign."  PR ¶29.  He told nobody he hadn't signed.  DX 4, 150:2-8.  Dr. Krishnan mistakenly thought he had signed.  DX 11, 22:8-24; DX 93, ¶5.  On that assumption, in fall 2017 he approved Dr. Jokich's bonus for the year

ended June 30, 2017. *Id.* After Rush decided to remove Dr. Jokich, Dr. Krishnan learned he had not signed the amendment. *Id.* Rush therefore paid him no bonus for the year ended June 30, 2018. D.E. 54, ¶150. It continued paying a bonus and enhanced benefits to the Division's other physicians, including after he left Rush. PR ¶¶34, 35.

## The development of conflict

Dr. Katherine Griem was employed by a radiation oncology practice that had a contract with Rush. PR ¶37. In 2016, Rush gave notice it would end that contract in June 2017, which in turn would end Dr. Griem's practice at Rush. Dr. Jokich, who admired her, vehemently but unsuccessfully pressed top Rush officials to reverse this decision. App. A-4. He was "very, very disappointed" in Dr. Goodman and Dr. Krishnan, and talked with and emailed "everybody" about physicians being disrespected at Rush. DX 4, 193:10-21, 198:7-17.

Dr. Jokich thought Dr. Bianco was doing a "piss-poor job" running the employed-physician practice, and said so to "anyone who would listen." DX 4, 198:22-199:13, 202:3-203:13, 206:4-209-13. Dr. DeCresce, who would become his boss in 2018, was dismayed by his arrogant treatment of Dr. Bianco at a mid-2017 meeting. DX 6, 109:8-116:14.

Dr. Paula Grabler, a physician in his Division, was in charge of breast imaging at Rush Oak Park Hospital. At her urging, Rush Oak Park acquired "3D Tomosynthesis" breast-imaging technology, which other Chicago academic hospitals have but which Dr. Jokich opposes. DX 4, 254:13-16, 263:5-9; PX FF, 98:1-101:13. He was angered and secretly declined to support her annual bonus in 2017 before backing off. DX 4, 258:20-259:4; DX 69; DX 7, 110:10-112:21.

By January 2018, he was deeply disillusioned with Rush, emailing a friend:

> Rush is becoming more of a hot mess. They keep picking the wrong people for leadership roles, which leads to bad decisions and bad morale. I think working physicians at Rush should have half the seats on the board of trustees to straighten everything out from the top down.

DX 26.

In February 2018, he caused an uproar by imploring Rush's top leaders and its Chair of Surgery to find a replacement for a recently-retired male breast surgeon. He claimed "my faculty are very concerned" about quality control of breast surgery and said "we also know which surgeons are 'good' and which are not." DX 30, 31. The Chair of Surgery was offended, and Rush's two remaining breast

surgeons, both women, took him as denigrating them. They and Dr. Grabler complained to Rush Human Resources that he had created a toxic atmosphere. DX 8, 59:16-60:13; DX 12, 112:16-113:15; DX 30. Dr. Jokich believed, without evidence, that a "number of the leaders of Rush" put them up to making this complaint. DX 4, 241:18-21.

In March 2018, Dr. Krishnan told Dr. Jokich he henceforth would report to Dr. DeCresce. DX 6, 121:1-9; DX 4, 185:20-188:20; DX 27. Dr. Krishnan also moved Dr. Grabler from Dr. Jokich's supervision to Dr. DeCresce's. DX 4, 422:11-423:16. That did not change Dr. Jokich's pay or title, but it incensed him. DX 4, 217:25-219:15, 428:9-19; DX 27, 28.

Human Resources retained Patience Nelson to investigate the women's complaint against him. When she interviewed Dr. Jokich, he referred to a discrimination suit filed against Rush by Norma Melgoza, a Mexican-American administrator who lost an Associate Vice President job in 2017 and was moved to a Director position. Dr. Jokich told Nelson the women's complaint was "retaliation or being targeted for future retaliation…in that he may be called as a witness in Norma Melgoza's lawsuit" and asserted the three women had complained "to

dissuade any future testimony." DX 32, pp. 5-6. He had no evidence for this belief. DX 4:243-8-20.

On April 9, 2018, Nelson issued a report of her investigation. It was mostly favorable to Dr. Jokich. She found no sex bias on his part, said she was "inclined to accept" that he had not meant to impugn the two breast surgeons, and declined to find his conduct "disruptive." However, she recommended that the leaders of Surgical Oncology, General Surgery, and Breast Imaging meet "to determine how they can best provide the remedial actions that [the women] seek and redress underlying tensions." *Id.,* p. 8. The report noted, in a single sentence, Dr. Jokich's theory of why the women had complained against him. *Id.,* pp. 5-6. Nelson's report was emailed to Dr. DeCresce among others on April 9, 2018. PX DD. Dr. DeCresce testified he may have seen an excerpt but not all of it. PX X, 134:21-23.

When Dr. DeCresce contacted Dr. Jokich to set up the meeting Nelson had recommended, Dr. Jokich angrily responded that he had "never been officially informed" that Dr. DeCresce was his boss and would "continue to operate under the assumption" that he reported to Dr. Byrd. DX 33.

That month, Dr. DeCresce was told that people developing two new "offsite" Rush locations were having difficulties with Dr. Jokich. Dr. DeCresce then transferred breast-imaging planning for these locations from Dr. Jokich to Dr. Grabler.  DX 6, 158:18-159:6; DX 16, ¶8; DX 4, 219:16-221:15; DX 33.  Dr. DeCresce's subordinate emailed Cancer Center managers about this shift.  DX 58.  Although the email did not criticize him, Dr. Jokich viewed it as "humiliating" and viewed the transfer of this function as a "demotion," although his title and pay were unaffected.  DX 4, 428:9-25.

### The removal decision

On May 21, 2018, Dr. Grabler discussed 3D Tomosynthesis at the Cancer Center's weekly breast conference, presenting data from a year of using it at Rush Oak Park Hospital and discussing criticisms of it. DX 7, 138:17-138:23; DX 39.  Dr. Jokich had long known Dr. Grabler had been invited to give this talk, and he had never objected.  DX 17, ¶2; DX 35; DX 4, 254:1-12, 255:2-256:9; DX 38.  She said nothing about him, and he admits she gave a "reasonable presentation."  DX 4, 257:7-10, 263:18-264:2.  Nonetheless, he thought her talk was "done to humiliate me in a public setting."  DX 4, 254:17-255:1, 270:10-271:2.

Although Dr. Krishnan had removed Dr. Grabler from Dr. Jokich's supervision, Dr. Jokich viewed her as "somebody under me giving a presentation about things that I don't agree with." He felt that "I had been not listened to for so many years, and I had been disrespected, and I had been just really humiliated in a lot of different situations, and [the presentation] was the final straw to me." *Id.,* 271:11-272:4.

The next day, he emailed 60 persons at Rush, including Drs. Goodman, Krishnan, and DeCresce and Mr. Dandorph, but not Dr. Grabler. DX 40; DX 4, 271:11-274:1. His email denounced 3D Tomosynthesis, called it a "marketing gimmick," and said it might be harming "our primarily minority and low-income population" at Rush Oak Park Hospital. He accused "administrators, business people, non-clinical nurses and lawyers, and ultimately the Board of Trustees" of making "all the major decisions based on money and business concerns" and said that the "working physicians…are the only ones, it appears, concerned with what is truly best for our patients, and who really have the Rush mission embedded in our hearts, which is to improve the health of the communities that we serve." DX 40.

Dr. DeCresce immediately emailed Dr. Goodman, Dr. Krishnan and Mr. Dandorph that Dr. Jokich should be removed. He cited his "latest outburst concerning his colleagues" and called his behavior "the antithesis of [Rush's] ICARE values." DX 18. Dr. Goodman and Mr. Dandorph immediately emailed back, supporting Dr. DeCresce's decision. *Id.* Dr. Goodman lamented "behaviors inconsistent with our values and what we expect from leaders." *Id.* Dr. Krishnan agreed as well. DX 11, 121:16-122:2, 123:9-22.

The next day, on orders of Dr. DeCresce, Dr. Jokich emailed Dr. Grabler a curt apology (which he admits was insincere) in which he stated, "I am not sure how you saw [the May 22 email] since your name was not on the recipient list." DX 4, 277:22-25; DX 44. He never apologized to leadership or the Board for his attack on them, and feels he has nothing to apologize for. DX 4, 271:11-274:1.

On May 24, 2018, Dr. DeCresce wrote Rush Human Resources, explaining why he had decided to remove and not replace Dr. Jokich. He cited Dr. Jokich's May 22 email, poor behavior toward colleagues, and low productivity. DX 45. The next day Rush retained counsel to advise how to remove him. DX 5, 201:19-203:19; DX 11, 135:10-17; D.E.

73, p. 2.  On June 6, counsel sent for client review a "privileged and confidential" draft termination letter, designed to go from Dr. Krishnan to Dr. Jokich.  It said he had a four-year agreement, explained why Rush could nonetheless terminate him, and said that barring a separation agreement, Rush would remove him as Director, reduce his salary to a nonsupervisory level, put him on paid leave, and non-renew his FEA when it expired June 30, 2019.  PX S.  Rush never sent this draft letter to him or anyone outside the attorney-client privilege.  D.E. 73 at 2-3.

## Dr. Jokich's accusations of June 2018

On June 11, 2018, 19 days after the removal decision of May 22, Dr. Jokich emailed Dr. Goodman that from attending anti-harassment training the previous month, he was now "very educated about harassment and discrimination," and was aware of "serious discrimination issues and unfair employment practices" at Rush involving gender, age, and national origin.  DX 46.  Dr. Goodman immediately replied that "we take these issues very seriously" and promised to investigate.  DX 47.  Dr. Goodman paused the removal process to do so.  DX 2, 250:7-22.  Dr. Jokich sent a longer statement to

Human Resources on June 18, 2019, alleging "retaliation" against himself and various discriminatory practices by Rush. DX 50, Ex. A. On June 19, Rush retained an attorney, the late Thomas Johnson, to investigate Dr. Jokich's accusations. DX 47, 49; DX 13, 6:5-9; PX U, 7:15-19.

On June 20, Dr. Byrd gave Dr. Jokich a favorable annual evaluation. PX D, at 327-28. On July 1, the Board approved a Medical Staff recommendation to renew Dr. Jokich's privileges for two years. PX F. Such privileges are necessary to practice at Rush, but are not sufficient, as the district court ruled. D.E. 40, 44.

After interviewing Dr. Jokich three times, Johnson wrote a long letter on July 29, 2018 to Dr. Goodman, reporting that Dr. Jokich had no evidence of the unlawful practices he had alleged. DX 4, 58:18-59:25; DX 50.

## The removal

On August 8, 2018, Drs. DeCresce and Krishnan offered Dr. Jokich a $1.3 million severance agreement and said if he refused it, they would remove him as Director, put him on leave, would lower his salary from $659,815 to a nonsupervisory level of $448,802, and would

not renew his FEA when its term expired on June 30, 2019. PR ¶¶84-86; DX 51; Ex. D to DX 60. On August 21, his lawyer rejected the offer and demanded a "standstill agreement." Ex. 6 to DX 15, p. 5. By letter of August 22, Dr. DeCresce removed him as Director, put him on leave, gave notice his salary would be lowered in 60 days, and gave notice of non-renewal of his FEA as of June 30, 2019. Ex. D to DX 60. Unlike the draft letter of June 6, 2018, the actual removal letter recited that because the Committee had rejected the 2016 Letter and he had not signed the amendment it later approved, he had no four-year agreement at all. *Id.*

Dr. Byrd was uninvolved in the May 2018 removal decision or the August 22 removal. When she returned from vacation several days later, Dr. DeCresce told her Dr. Jokich was gone. She raised no objection, even after he sued in state court on August 29, seeking a TRO restoring him to his position. DX 9, 136:14-141:3, 147:11-152:14, 152:22-153.8; DX 6, 220:3-20; DX 15.

## The litigation

On August 31, 2018, Judge David Atkins denied Dr. Jokich's motion for a TRO, ruling among other things that Rush's employment

actions had left his Medical Staff privileges intact. D.E. 18 at App. 249-50. On September 11, 2018, the Appellate Court affirmed that denial. *Id.* at App. 276. On remand, he moved for a preliminary injunction and demanded an evidentiary hearing and expedited discovery. *Id.* at App. 277-446. Instead, on October 4, 2018, Judge Atkins stayed discovery and ordered Rush to file a planned dispositive motion to dismiss by October 25. *Id.* at App. 447.

On October 22, 2018, Dr. Jokich filed an EEOC charge calling his removal unlawful retaliation. Ex. A to D.E. 1. On October 24, he moved to voluntarily dismiss his state suit. Had he waited longer, 735 ILCS 5/2-1009(b) would have allowed Judge Atkins to decide the dispositive motion Rush would have filed on October 25. Instead, as required by §1009(a), Judge Atkins dismissed the suit without prejudice. D.E. 18, at 448.

On November 29, 2018, Dr. Jokich filed this suit, asserting ADEA and Title VII retaliation claims and realleging the state claims. D.E. 1. In March 2019, the district court dismissed three state claims, including the "staff privileges" claim. D.E. 40, 44.

On June 30, 2019, Dr. Jokich's FEA expired and his Rush employment ended. DX 16, ¶12.

Rush moved for summary judgment in May 2020. Dr. Jokich filed a 103-page Response to Rush's Local Rule 56.1(a) Statement. D.E. 149. The district court denounced the Response's multiple violations of the Local Rule, but reviewed the record in "laborious detail" to "separate wheat from chaff." App. A-3, A-22. It then granted summary judgment against the statutory retaliation claims, and relinquished jurisdiction over the remaining state claims. App. A-23. Dr. Jokich moved under F.R.Civ.P. 59 to amend that judgment by reasserting jurisdiction over the state claims, since Illinois' "single-refiling" rule would prevent them from being refiled in state court. D.E. 176. Over Rush's opposition (D.E. 179), the court granted that motion. App. A-24. It then granted summary judgment to Rush on all remaining state claims, terminating the case. App. A-40.

## SUMMARY OF THE ARGUMENT

I.     The district court correctly granted summary judgment against Dr. Jokich's Title VII and ADEA "retaliation" claims.

A.     Such claims require "protected activity."  Dr. Jokich has abandoned any claim of "protected activity" occurring before the removal decision of May 22, 2018, with one exception:  his statement to Nelson that he believed the three women complained about him "to dissuade any future testimony" in Melgoza's lawsuit.  Contrary to the district court's tentative view, this statement, made to a person who had nothing to do with Melgoza's claim, was not protected "participation" in Melgoza's lawsuit.

B.     No reasonable jury could have found that the statement to Nelson, or the other statements he continues to assert as "protected" (his assertions in June 2018 about discriminatory practices at Rush), had a causal link to his removal.  Overwhelming evidence proved Rush removed him for conduct no reasonable employer would have tolerated from a leadership-level manager.  Nothing linked his April 2018 statement to Nelson to the May 22 removal decision.  The six-week interval between the two was too long to infer a causal link, given the intervening circumstance of his May 21 attack on Rush leadership and the Board.  His statements of June 2018 could not have caused a removal decision taken three weeks earlier.  No reasonable jury could

find, as he argues, that it was really the June 2018 statements that caused the removal decision. His insubstantial "circumstantial evidence" of "suspicious conduct" could not allow a reasonable jury to find Rush's explanation for removing him was a lie to cover a retaliatory motive.

C.     Dr. Jokich's other retaliation claim -- that Dr. DeCresce's moving a minor responsibility from him to Dr. Grabler in April 2018 was an unlawful "demotion" made in retaliation for his statement to Nelson -- is barred, since he never mentioned that action in his EEOC charge or his complaints. In any event, the statement was unprotected, and no reasonable jury could find the move was an "adverse employment action" or find a causal link between it and the statement.

II.     The court correctly granted summary judgment against the only three state claims Dr. Jokich has not abandoned.

A.     The 2016 Letter never took effect, so it gave him no right to a four-year term. Its condition precedent of Board approval failed. No reasonable jury could find Rush intended to waive that failure. To prove such intent, Illinois law required a "clear, unequivocal and decisive" act, consistent *only* with an intent to waive the Board-

approval requirement. He does not argue that the *Board* intended to waive the Board-approval condition or let management waive it. Instead, he only argues about management's intent to waive. Since only the Board's intent matters, management's intent is irrelevant. In any case no reasonable jury could find "clear, unequivocal and decisive" evidence of management's intent to waive.

Likewise, no reasonable jury could find Rush estopped from enforcing the Board-approval condition. Dr. Jokich offered no evidence Rush misled him. He could not have reasonably relied on management action or inaction to conclude that the Board-approval condition no longer applied. And the undisputed facts of his conduct show he did nothing in reliance on any belief that the 2016 Letter was in effect.

B.     No reasonable jury could accept Dr. Jokich's claim that removing him from his Director position and putting him on paid leave for the remainder of his FEA's current term was a "termination" from his position that required "cause" as defined in his FEA. The FEA's "cause" requirement applies only when Rush *terminates the FEA itself* prior to the end of a term. Neither Rush nor Dr. Jokich did that.

C.     Likewise, no reasonable jury could accept Dr. Jokich's claim that his removal breached a Medical Staff Bylaw providing that as a Division Director he served at the discretion of his Department Chair, Dr. Byrd.  That Bylaw cannot be given the absurd interpretation of banning a removal that was decided on by Dr. DeCresce (to whom Dr. Byrd viewed Dr. Jokich as reporting), was approved by Rush's top executives (to whom Dr. Byrd reported), and was never objected to by Dr. Byrd.

## ARGUMENT

After serving Rush well for years, Dr. Jokich toward the end came unglued.  Enraged by his view of Rush's wrong direction, he fought with key colleagues and publically denounced Rush's management and Board.  No leadership-level manager who does this can expect to stay employed.  He unwisely rejected a generous severance offer and sued in state court when Rush removed him.  When that suit drew adverse rulings, he concocted an EEOC charge of "retaliation" and used it to switch his state claims to federal court.  He litigated there chaotically until the district court buried all his claims, state and federal.  His

appeal has abandoned the majority of his contentions below, and offers

no good reason to exhume any claim he still is pursuing.

## I. THE COURT RIGHTLY REJECTED THE RETALIATION CLAIMS.

### A. No statement by Dr. Jokich before the removal decision was "protected."

ADEA and Title VII "retaliation" claims require statutorily-

protected activity, an adverse employment action, and a causal link

between the two. *Lewis* v. *Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).

There are two categories of protected activity: "opposing" practices

these statutes make unlawful, and "participating" in an "investigation"

or "proceeding" under them. *Speedy v. Rexnord Corp.,* 243 F.3d 397,

404 (7th Cir. 2001).

On appeal, Dr. Jokich has abandoned his many claims that he

committed protected activity before the removal decision of May 22,

2018, with one exception: his statement to Nelson that the two breast

surgeons and Dr. Grabler complained about him to "dissuade any future

testimony" on behalf of Melgoza.[1] He relies on the district court's

---

[1] His brief abandons his claim of statutory protection for (1) advocating retaining Dr. Griem (App. A-17 n.17); (2) purportedly alleging discrimination against 11 older physicians (*id.*); (3) statements about an alleged "Trump mask" incident between Dr. DeCresce and Mendoza (App. A-6); (4) being named in Melgoza's "initial

finding that this statement could be protected "participation" in Melgoza's lawsuit, "crediting Jokich's subjective belief and the reasonableness thereof." App. A-17.

That finding was too generous. Dr. Jokich did not dispute that in June 2018, he told Thomas Johnson he had *not* participated in or supported Melgoza's claim. DX 50, p. 1; DX 13, 47:18-23, 100:16-101:5; DX 4, 462:2-481:15; JX A, ¶50. Speculating to Nelson, who was unconnected with Melgoza's lawsuit, that his own conduct was being complained of because he might be a witness in that suit wasn't "participating" in it, and didn't help Melgoza. The district court cited *Beamon v. Hewitt Associates LLP,* No. 03 C 705, 2004 WL 2038169, at *6 (N.D.Ill. 2004), which held that cooperating in an employer's internal investigation of another employee's complaint of discrimination might be protected "participation." App. A-17. But Nelson wasn't investigating Melgoza's claims. Moreover, in *Hatmaker v. Memorial Med. Ctr.,* 619 F.3d 741 (7th Cir. 2010), *cert. denied,* 562 U.S. 1270 (2011), this Court held that an employer's investigation of an internal

---

disclosures" (App. A-6); (5) emails to Human Resources alleging unspecified "retaliation" (App. A-10); and (6) comments about Melgoza in a meeting with Division physicians (App. A-10).

discrimination complaint is not a "proceeding" for purposes of a "participation" claim, with the possible exception of an investigation made as a follow-up to an employee's filing an EEOC charge. *Id.* at 747.

Moreover, the district court had no basis for "crediting the reasonableness" of Dr. Jokich's statement about why the women had complained about him. *See Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 891 (7th Cir. 2004) (requiring a reasonable basis for activity under Title VII's participation clause). It was a wild conspiracy theory for which he admitted he had no evidence. See above at 9-10.

## B. No reasonable jury could find a causal link between the removal and Dr. Jokich's two surviving claimed instances of protected activity.

To survive summary judgment on causation, Dr. Jokich had to show that a reasonable jury could find he would have kept his job had he refrained from his supposed protected activity and "everything else remained the same." App. A-19, *quoting Gehring v. Case Corp.,* 43 F.3d 340, 344 (7th Cir 1994), *cert. denied,* 515 U.S. 1159 (1995). No reasonable jury could make this finding.

### 1. Rush offered overwhelming evidence of its legitimate reason for removing him.

Rush offered what the court called a "mountain of evidence" of the conflicts Dr. Jokich provoked in his last two years at Rush. App. A-19. The removal decision itself and its motive were documented in real time. Dr. DeCresce reacted with dismay to Dr. Jokich's email of May 22, 2018 and immediately emailed Rush's top leaders that it was time to remove him. They immediately agreed, with Dr. Goodman lamenting Dr. Jokich's violation of Rush's values. See above at 13. Dr. Jokich's brief never mentions this decisive episode.

His conduct *demanded* removal. Consider a hypothetical Clerk of a hypothetical Twelfth Circuit who thinks the Judges are making the Court a "hot mess," and tells "anybody who would listen" that they are disrespecting litigants. Suppose he gets into conflicts with other personnel, so that three of them complain he is toxic. Suppose when the Chief Judge then sets up a meeting to smooth the waters, he snarls that she has no authority over him. Suppose when the Circuit Executive implements a new procedure, he denounces it in an email to 60 persons throughout the courthouse, including the Chief Judge (but not the Circuit Executive), and concludes:

> It is a sad state of affairs when at the "new" Twelfth Circuit, the Circuit Executive and ultimately the Judges are making all the major decisions on the basis of money and business concerns, and not we working staff, who are the only ones, it appears, concerned with what is truly best for litigants and who really have the Twelfth Circuit's mission embedded in our hearts, which is to do justice in the circuit we serve.[2]

He would have to go. It wouldn't matter that he had been there for years, had been well-evaluated, and truly believed his denunciation. This, *mutatis mutandis,* is the story of Dr. Jokich. As Dr. DeCresce, who decided on his removal, put it: "People who express things like that should not be in a position of authority in an organization." DX 6, 176:4-12.

To rebut this mountain of evidence of why Rush removed him, Dr. Jokich offered no document showing disapproval by *anyone* at Rush of *anything* he originally claimed to be protected activity, even though Rush produced thousands of pages of internal emails about him. D.E. 87, ¶10.[3] When his June 11, 2018 email to Dr. Goodman alleged

---

[2] To make the parallel even closer, suppose the hypothetical Clerk, behind the Judges' backs, urges Twelfth Circuit staff to form a union. In May 2018, Dr. Jokich did just that, asking his breast imagers to sign a petition to unionize employed physicians. They refused. Rush discovered this act in 2020 when he deposed an imager who was at this meeting, whereupon it asserted an after-acquired evidence defense to limit his damages. PX FF, 92:10-94:15; D.E. 107, 137.

[3] In contrast to Rush's copious production, Dr. Jokich's litigation conduct was evasive and disorderly. After eight months of producing *nothing*, amid increasing

unlawful practices at Rush, Dr. Goodman replied appreciatively and

promised an investigation.  DX 47.

### 2. No reasonable jury could find that Dr. Jokich's June 2018 statements caused his removal.

For purposes of this appeal, Rush accepts the district court's

finding (App. A-17-18) that Dr. Jokich's statements of June 2018

alleging unlawful practices at Rush were protected, even though

Johnson found he had no basis for making them.  DX 50.  But they

could not have caused a removal decision made on May 22, 2018.  This

truism forces Dr. Jokich to argue that (1) Dr. Goodman was lying when

he testified that Dr. Jokich's June communications caused him to *delay*

the removal; and (2) in reality these communications made Dr.

Goodman decide to get rid of him.  PB 49-54.

The district court did not buy this desperate argument.  App. A-

21.  No reasonable jury could either.  First, no document or witness

contradicted Dr. Goodman, and the undisputed chronology fit his

---

protests from Rush, Dr. Jokich produced 54 pages.  D.E. 87, ¶¶10, 14-15, 20.  Later
he was found in violation of F.R.Civ.P. 30(c)(2), and sanctioned, for refusing to
answer unprivileged deposition questions about mitigation of damages (D.E. 129, at
3-7); was found in violation of F.R.Civ.P. 26(e) by a last-minute identification of
numerous previously-unidentified witnesses (*id.,* at 7-11); and was found in flagrant
violation of Local Rule 56.1 on the summary judgment motion (App. A-2-3).

testimony like a glove.  On May 22, 2018, Dr. DeCresce decided to remove Dr. Jokich, and Dr. Goodman agreed the same day.  On May 24, Dr. DeCresce described his decision to Human Resources as one already taken, not one needing further approval.  On May 25, Rush hired counsel to plan the removal.  By June 6, counsel had drafted a removal letter.[4]  On June 11, Dr. Jokich emailed Dr. Goodman claiming unlawful activity, and Dr. Goodman promised an investigation.  On June 19, Rush hired Johnson to do it.  On July 29, Johnson reported to Dr. Goodman that Dr. Jokich had nothing to support his accusations.  On August 8, Rush told him he had to go.  See above at 13-16.

Second, Dr. Goodman's testimony of delaying execution of the removal decision because of the June 11 email rings true.  Every experienced employment lawyer is familiar with employees on thin ice who make last-minute allegations of discrimination to prepare the ground for retaliation claims if they are fired.  Rush had reason to suspect that Dr. Jokich's June 11 email, written in stilted legalese, pursued that strategy.  Rush would have played into the hands of such

---

[4] Rush did not rely on this draft removal letter below, and believes it is inadmissible.  See below at 52.  But since Dr. Jokich continues to rely on it (PB 32-33), he cannot deny what it shows about the timing of the removal decision.

a strategy had it removed him as planned without first investigating his belated accusations.

In contrast, Dr. Jokich's theory rings false. It requires the breathtaking assumption that Dr. Goodman, despite his endorsement on May 22 of Dr. DeCresce's removal decision, really decided only on receiving the June 11 email that Dr. Jokich had to go, then diabolically hired Johnson to conduct a sham investigation.

To argue that a jury could nonetheless find such a scheme, Dr. Jokich first cites Dr. DeCresce's May 26 memo to Human Resources, which said he wanted to work with Human Resources to "terminate" Dr. Jokich the following week. Ex. 7 to DX 15. Dr. Jokich says he was not removed until August, and when he was, he was not "terminated" but removed through a "fundamentally different" process. PB 49. This argument is worthless. Dr. DeCresce wanted him removed immediately, but he is not a lawyer. Dr. Jokich was a high-paid, likely litigious physician with a complicated contractual relationship with Rush. Rush therefore hired outside counsel the day after Dr. DeCresce's May 26 memo to advise how the removal should be handled. The method Rush adopted was to seek his departure under a severance

agreement, and if he refused, to put him on paid leave and let his one-year FEA term expire without renewal on June 30, 2019.  None of this history would allow a reasonable jury to discredit Dr. Goodman's testimony that in June he paused an already-decided removal process.

Second, Dr. Jokich cites Dr. Goodman's telling Johnson in mid-June 2018 that Dr. Jokich was "a key player in breast imaging with whom he had a positive relationship, and he mentioned nothing about terminating Appellant."  PB 50, *citing* PX Ex. U at 10:21-11:12.  Indeed he didn't.  It is undisputed that Rush never asked Johnson for, and he never gave, advice on how to terminate Dr. Jokich.  PX U, 144:17-145:8.

Third, Dr. Jokich calls Dr. Goodman's testimony "foggy" and "self-serving."  PB 50.  Dr. Goodman testified that "we had a pause.  I don't know if I initiated or somebody else did.  We were just doing this.  So I don't think I did exactly, but I did want to make sure that we heard what Dr. Jokich had to say."  PX V, 173:5-14.  That Dr. Goodman could not remember whether the "pause" decision was "initiated" by him or a management colleague does nothing to disprove that the decision was made.  He testified that Dr. Jokich's June statements played no role

"other than leading [him] to put a pause button on a termination which was already in progress." *Id.,* 249:4-8.

Dr. Jokich's "self-serving" epithet for Dr. Goodman's testimony likewise has no value. It is part of his more general argument that the district court erred by "accepting self-serving, uncorroborated deposition testimony which would have had to be seen and heard in order to evaluate its credibility." PB 45. "As we have repeatedly emphasized over the past decade, the term 'self serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini,* 724 F.3d 965, 967 (7th Cir. 2013); *accord, Kroger v. Dart,* 950 F.3d 971, 974 (7th Cir. 2020). *Hill* explicitly overruled cases relying on the "self-serving" rationale to discredit testimony. 724 F.3d at 967 n.1. If plausible testimony is uncontroverted and fits the surrounding facts, it carries the day on summary judgment, "self-serving" or no.

### 3. Dr. Jokich had no evidence to link his statement to Nelson to his removal.

Since the June statements could not have caused the May removal decision, the remaining causation issue is whether his "witness in Melgoza's lawsuit" statement, even if protected, caused Dr. DeCresce's

decision six weeks later to remove him. App. A-21. No reasonable jury could so find, even if one assumes that Dr. DeCresce noticed the report's isolated sentence about that statement. (When Dr. Jokich deposed Dr. DeCresce, he steered shy of this subject, never asking whether he read this sentence in Nelson's report. PX X, 134:8-148:4.) In *Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012), *cert. denied,* 568 U.S. 963 (2012), a five-week gap between the protected activity and the adverse employment action was too long to infer causation, particularly since "significant intervening events" occurred. *Id.,* at 966-67. "For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021), *quoting Kidwell,* 679 F.3d at 966. This case is *Kidwell.* In the six weeks between Nelson's report and Dr. DeCresce's removal decision came the "intervening event" of Dr. Jokich's public attack on Rush's top leadership and Board -- enough to get him removed twice over.

### 4. Dr. Jokich's "wrong causation standard" argument has no merit.

The district court summed up the retaliation claim by finding that "Jokich's termination had nothing to do with his allegations of unlawful discrimination at Rush." App. A-22. Dr. Jokich argues that the court thereby erroneously applied a "sole cause" standard of causation rather than a "but-for" standard. PB 52-55. This is idle. The court didn't say his protected activities had to be the *only* cause of the removal. It said they had *no* role in causing the removal.

Dr. Jokich also argues that while there was much conflict between him and Rush in his last two years, Rush didn't remove him until August 2018. Hence, he says, a reasonable jury could find that although his unprotected history of conflict with Rush played a causal role in the removal, the supposedly protected statements of April and June 2018 were the "straw that broke the camel's back." PB 52-54. This argument has no merit either. As discussed above, no reasonable jury could dispute that the removal decision happened on May 22, not in June, or could find that his wild statement to Nelson about why the women had complained about him caused the May 22 removal decision six weeks later.

### 5. Dr. Jokich's "circumstantial evidence" arguments have no merit.

Given the overwhelming evidence supporting Rush's explanation for removing Dr. Jokich, it would take powerful "circumstantial evidence" indeed to raise a jury issue on whether Rush's explanation was a pretext, which "means a lie, specifically a phony reason for some action." *Chatman v. Bd. of Educ. of City of Chicago,* 5 F.4th 738, 746 (7th Cir. 2021).

Dr. Jokich's circumstantial evidence of pretext is negligible. None of it rebutted the "mountain of evidence" of his conflicts with his superiors and his colleagues, or the testimony of the decision-makers about why they removed him, or the real-time documentary evidence supporting that testimony. Instead, all of it fell into the category of supposedly "suspicious" circumstances.

*"Suspicious timing"* (PB 56-57). As discussed above, there was nothing "suspicious" about the six-week interval between the Nelson report and the May 22 removal decision, and the June statements postdated that decision.

*The evaluations from Dr. Byrd* (PB 58-59). Dr. Jokich's favorable annual evaluations from Dr. Byrd, including one in June 2018, were

useless to show pretext. Rush *agrees* that Dr. Jokich is a competent

breast imager who built a good breast imaging service. App. A-22. A

letter Dr. DeCresce wrote to patients who complained of the removal

says it all:

> Dr. Jokich reported to me at Rush, and he is indeed a skilled
> breast imaging physician. It is natural that you would be
> upset that he is no longer available at Rush to treat you.
> The circumstances that led to his current dispute with Rush
> are complicated. Dr. Jokich became vociferously critical of
> Rush, its people, and its programs in recent years, to the
> point where Rush concluded that it was not viable to
> continue employing him in an important leadership position.
> Dr. Jokich rejected attempts to resolve this dispute by
> agreement, and filed a lawsuit, as he is entitled to do.
> Although the courts have thus far rejected his contentions,
> Rush wishes him well and hopes that he will continue his
> practice at an institution of which he is less critical.

Ex. 11 to DX 15.

Moreover, in judging pretext arguments, "[i]t is the perception of

the decisionmaker that is relevant." *Weihaupt v. Am. Med. Assoc.,* 874

F.2d 419, 428 (7th Cir. 1989) (citation omitted). Dr. Byrd was

uninvolved in the decision to remove Dr. Jokich, and other than

evaluating him annually, she had no substantial contact with him and

his Division. See above, at 3. Her June 2018 evaluation therefore could

never show that his real bosses -- Drs. DeCresce, Krishnan, and

Goodman -- were lying when they testified they found his conduct as a leader unacceptable. As for her earlier evaluations, "[t]he issue is not the employee's past performance but 'whether the employee was performing well at the time of [his] termination.'" *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991)); *see also Igasaki*, 988 F.3d at 959.

*The renewal of privileges* (PB 59-60). Similarly useless to create a factual issue on pretext was the Board's renewal in June 2018, on recommendation of the Medical Staff, of Dr. Jokich's Medical Staff privileges. See above at 15. He offered no evidence that anyone involved in the removal decision was involved in this renewal process.

The irrelevance of the privileges renewal is confirmed by the Medical Staff's denial of a grievance he filed under the Medical Staff Bylaws' grievance procedure. He asserted that Rush deprived him of his staff privileges by employment actions that ended his ability to practice there. Ex. I to DX 60. The Medical Staff rejected the grievance, writing:

> The Medical Staff had no role in [Rush's employment] decision and made no decision to terminate, suspend or

otherwise restrict your privileges as set forth under Section
15.1(a) [of the Bylaws] which describes which actions trigger
a physician's hearing rights. Consequently, all of the notice
and other rights set forth under [the relevant Bylaws
procedure for privilege revocation] do not apply to your
situation. While we recognize that you are not able to
exercise your clinical privileges during your administrative
leave, your Medical Staff membership and clinical privileges
remain unaffected.

Ex. I to DX 60, p. 3. The district court later reasoned identically in

dismissing the "staff privileges" claim. D.E. 40 at 17-19. As this

decision shows, the Medical Staff's renewal of Dr. Jokich's privileges did

not imply that Rush should continue his employment.

*"Shifting explanations."* Dr. Jokich offers two cryptic sentences

asserting without specifics that Rush's explanations for removing him

have been "shifting" and "inconsistent." PB 58-59. Such undeveloped

arguments are waived. *Kelly v. U.S. E.P.A.*, 203 F.3d 519, 522 (7th Cir.

2000).

In any event, as the district court found, there were no shifting or

inconsistent explanations. App. A-22. Every "explanation" document --

Dr. DeCresce's email of May 22, his bosses' responses to him the same

day, his May 26 memo to Human Resources, the draft removal letter of

June 6 Dr. Jokich wants this Court to consider, the actual removal

letter of August 22, and Dr. DeCresce's post-removal response to complaining patients -- sounded the same theme: Dr. Jokich had not behaved as a leader should, and had to go. *See Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) ("the explanations must actually be shifting and inconsistent to permit an inference of mendacity"); *Perfetti v. First Nat'l Bk. of Chicago,* 950 F.2d 449, 456 (7th Cir. 1991), *cert. denied,* 505 U.S. 1205 (1992) ("elaborating on a justification" is not an inconsistency suggesting pretext).

"*Violation of policies.*" Dr. Jokich cites an internal policy (PX II) dealing with "disruptive physicians." PB 61-63. He claims that Rush didn't follow its procedures, and that this "fact" would enable a jury to find that Drs. DeCresce, Krishnan, and Goodman lied about why they removed him. PB 61-63. The argument has no merit. The policy addresses conduct implicating the "safety of Rush patients, visitors, guests, employees, faculty, and students." PX II, p. 1. Dr. Jokich's conduct was not a safety issue. He is a competent physician and his Division did good work. Rather, to quote Dr. DeCresce, the issue was whether it was "viable to continue employing him in an important

leadership position" when he had become so "vociferously critical of Rush, its people, and its programs."  Ex. 11 to DX 15.

His argument about the "disruptive physician" policy echoed his unsuccessful claim that Rush violated the Medical Staff Bylaws by not instituting proceedings against his staff privileges.  In dismissing that claim, the district court found that nothing in the Bylaws required Rush to move against his staff privileges, regardless of what he had done. D.E. 40, at 19; D.E. 44, at 2.  He has abandoned this "privileges" claim on appeal.  Similarly, nothing in the "disruptive physician" policy required Rush to treat any particular conduct as "disruptive" so as to force it to initiate action under that policy.  PX II.

In addition, the policy envisages procedures for the *Medical Staff* to follow.  He was an unacceptable employee, not an unacceptable Medical Staff member.  Thus, asked whether Rush followed this "disruptive physician" policy, Rush's head of Human Resources testified:  "Well, I don't think we ever got to that point, honestly, because I think we made the decision not to follow that route and not renew Pete's contract in the end."  PX AA, 176:3-12.

In sum, Dr. Jokich's "suspicious circumstances" raised no suspicion, much less enough for a reasonable jury to conclude that a single remark to Nelson caused Rush to decide six weeks later to remove him.

In so concluding, the district court did not consider the evidence piecemeal, as he charges. PB 20. The court acknowledged the need to consider the evidence as a whole, and stated that its conclusion was supported by the "entirety of the record in this case," after a review of the record in "laborious detail," which his flouting of Local Rule 56.1 had forced the court to undertake.

Nor did the court "weigh conflicting evidence," as Dr. Jokich charges. PB 45. Since no witness or document contradicted Rush's "mountain of evidence" of why it removed him, Dr. Jokich could only argue that "suspicious circumstances" entitled a jury to find this explanation to be a pack of lies. A party who takes that position forces a district judge to assess whether his evidence, taken as true, would allow a rational jury to make that finding. The court made that assessment and rightly answered no.

### C.     Dr. Jokich has no retaliation claim based on a "demotion."

The district court rejected Dr. Jokich's claim that his statement to Nelson caused Dr. DeCresce to "demote" him by transferring to Dr. Grabler the job of planning for breast imaging at two Rush "offsite" locations under development.  App. A-21; *see* PB 47-48.  The district court should not have considered this "demotion" claim, nor should this Court, because an employment-discrimination plaintiff cannot rely on alleged adverse actions never pled in the complaint.  D.E. 134 at 13 n. 3, *citing Rahn v. Bd. of Trustees of N. Illinois Univ.*, No. 09 C 3033, 2014 WL 11395169, at *4 (N.D.Ill. June 6, 2014), *aff'd*, 803 F.3d 285 (7th Cir. 2015); *Ballard v. Solid Platforms, Inc.*, No. 2:10 CV 238, 2012 WL 1066760, at *10 n. 3 (N.D.Ind. Mar. 27, 2012).  Dr. Jokich's EEOC charge and his complaints said nothing of the transfer, but relied solely on his removal as Division Director.  D.E. 1, 49.

In any event, no reasonable jury could accept this "demotion" claim.  First, as discussed above at 24-25, the statement on which this claim is based was not "protected."

Second, this redistribution of one function was not an adverse employment action.  App. A-21.  Dr. Jokich relies on cases stating that

an adverse action "might be indicated by significantly diminished material responsibilities." PB 48, *citing Crady v. Liberty Nat. Bank & Tr. Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). But a transfer of job responsibilities is not materially adverse "unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Koty v. DuPage Cty., Ill.*, 900 F.3d 515, 520 (7th Cir. 2018) (emphasis in original, *quoting Stephens v. Erickson*, 569 F.3d 779, 790-91 (7th Cir. 2009)). Otherwise, "minor and even trivial employment actions that an...employee did not like would form the basis of a discrimination suit." *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996) (cleaned up).

This Court has therefore insisted that the change have a concrete repercussion beyond hurting a plaintiff's ego. For example, the Court has found or suggested such repercussions in depriving the plaintiff of the "building blocks" for promotion (*Traylor v. Brown,* 295 F.3d 783, 789 (7th Cir. 2002)), or rendering plaintiff "virtually powerless" in her main duties (*Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013)), or seeking to "to exploit a known vulnerability of the plaintiff"

(*Porter v. City of Chi.*, 700 F.3d 944, 955 (7th Cir. 2012)), or assigning plaintiff to wretched job locations (*Collins v. Illinois*, 830 F.2d 692, 703-04 (7th Cir. 1987)), or "a dramatic downward shift in skill level required to perform job responsibilities" (*Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994)).

Dr. DeCresce's transfer of one function to Dr. Grabler had no such repercussions. It enraged Dr. Jokich, but it made his job a tad easier, not harder. In fact, he claimed he had been cut out of the planning function for the offsite locations a year earlier. DX 4, 210:6-211:1; DX 25. Dr. Grabler testified that this function required little of her time. DX 17, ¶3.

Third, as the district court found, no reasonable jury could find a causal link between this transfer and Dr. Jokich's statement to Nelson. App. A-21. Dr. DeCresce testified he acted because of complaints from people involved in the offsites that they were having difficulties with Dr. Jokich. See above at 11. Dr. Jokich offered no evidence these complaints weren't made, and Dr. DeCresce's testimony rang true, given Dr. Jokich's mushrooming conflicts with colleagues in this period and the fact that Dr. Jokich was resentful, by his own account, of

having been cut out of the offsite planning process a year before. To insinuate that his statement to Nelson might have alarmed Dr. DeCresce, Dr. Jokich asserts that Dr. DeCresce was "a named defendant in the Melgoza lawsuit." PB 47. He was not. Only Rush was. DX 52, 54.

Dr. Jokich also argues that a jury could reject Dr. DeCresce's testimony because the transfer happened eight days after the Nelson report was distributed. PB 47. As discussed above, such timing, standing alone, is not enough for a jury to reject Dr. DeCresce's uncontroverted and plausible testimony of why he made the transfer.

In sum, the court rightly threw out Dr. Jokich's retaliation claims on summary judgment.

## II. THE COURT RIGHTLY REJECTED THE STATE CLAIMS.

Of the nine separate breaches of contract Dr. Jokich alleged in the district court, he argues only three on this appeal.[5] Given his

---

[5] His brief makes no mention of the following claims: (1) Rush revoked his staff privileges without following the Bylaws' procedures (D.E. 40, at 17-19); (2) Rush needed "cause" under his FEA for nonrenewal (D.E. 1, ¶¶72-74); (3) Rush violated the FEA by lowering his salary (D.E. 40, at 13-14); (4) his FEA forbade Rush from putting him on paid leave (*id.* at 14); (5) Rush violated his FEA, and the Illinois Hospital Licensing Act, by restricting his ability to treat or communicate with patients (App. A-34 n.11); and (6) Rush violated the FEA by not paying his bonus for FY 2017 (D.E. 49, ¶¶146-54).

shameless forum-switching (see above at 16-17), ample precedent would have justified the court, after throwing out the federal claims, in relinquishing supplemental jurisdiction over the remaining state claims, thereby dooming them under Illinois' "single-refiling" rule.[6] Instead, the court exercised its discretion to reassert jurisdiction, decided the state claims on the merits, and decided them correctly.

### A. Summary judgment was required on the "2016 Letter" claim.

Dr. Jokich argued that the 2016 Letter, with its four-year term, bound Rush despite the Board's rejecting it. He never relied on the June 2017 amendment, which he never signed and which he alleged to

---

[6] *See Guaranteed Rate, Inc. v. Warren Barr*, No. 12 C 5362, 2013 WL 2452293, at *6 (N.D.Ill. June 5, 2013), holding that if the court exercised supplemental jurisdiction in this situation, "litigants would be guaranteed a federal forum to litigate their state-law claims even where all federal causes of action are dismissed by simply filing and voluntarily dismissing in state court before filing a federal suit"); *accord, Bhatia v. Vaswani*, No. 18-CV-2387, 2020 WL 3578004, at *4 (N.D.Ill. July 1, 2020). *Foster v. Loc. Union 8A-28A Metal Refinishers, Painters, Sign & Display, Equip. & Auto. Painters*, No. 16 C 4174, 2018 WL 4467118 (N.D.Ill. Sept. 17, 2018), declined to apply *Guaranteed Rate* and *Bhatia* in the absence of "egregious forum-shopping by a sophisticated plaintiff." *Id.* at *3. Dr. Jokich and his lawyers are sophisticated, and their forum-shopping was scandalous. Dr. Jokich claimed he changed courts because after filing his EEOC charge, he needed to litigate his retaliation claim in federal court and this Court "deprecates" claim-splitting. D.E. 180, at 8. This explanation was not credible, given the belated timing of raising the retaliation claims, their vacuity, and his haste, long before he was ready to file his federal suit, to dismiss his state case before the date he knew Rush would file a dispositive motion. The extraordinary fact that his brief argues his state claims before it argues the federal claims is emblematic of how he cooked up the federal claims to get his state claims away from a state forum where they were in trouble.

be a nullity.  App. A-37 n.15; D.E. 1, ¶¶61-69; PB 8.  The court rejected his theories -- implied waiver, estoppel, and the covenant of good faith -- to excuse the failure of the 2016 Letter's condition precedent.  On appeal, he argues only implied waiver and estoppel.  Both arguments fail.

### 1.   There was no intentional implied waiver.

Illinois cases use "implied waiver" to describe two different theories, one a true waiver theory and the other an estoppel theory. *Lavelle v. Dominick's Finer Foods, Inc. of Illinois*, 592 N.E.2d 287, 291-92 (Ill. App. 1992); *R.G. Ray Corp. v. Maynard Mfg. Co.*, No. 92 C 3708, 1993 WL 462841, at *3 (N.D.Ill. Nov. 8, 1993).  A true waiver requires "the intentional relinquishment of a known right." *Wikoff v. Vanderveld*, 897 F.2d 232, 241 (7th Cir. 1990).  If that intent is to be implied from a party's conduct, there must be "clear, unequivocal and decisive" conduct that is "inconsistent with any intention other than to waive." *Sphere Drake Ins. Ltd. v. American Gen. L. Ins. Co.*, 376 F.3d 664, 676-79 (7th Cir. 2004); *Home Ins. Co.* v. *Cincinnati Ins. Co.*, 821 N.E.2d 269, 282 (Ill. 2004).

The relevant "Rush" intent was that of Rush's *Board*, because the 2016 Letter required *Board* approval through its Compensation Committee. That intent was undisputed: the Committee intended to disapprove the 2016 Letter absent a mutually-acceptable amendment. It never delegated authority to management to waive the approval requirement. DX 2, 246:11-20.

Dr. Jokich never addresses the Board's intent to waive the Board-approval requirement, but only argues about what management did or didn't do. PB 24-36. That was irrelevant. Since the tail doesn't wag the dog, courts don't enforce contracts requiring board approval that was never obtained. *See, e.g., Southwest Forest Indus., Inc. v. Sharfstein*, 482 F.2d 915, 925-26 (7th Cir. 1972); *Glass v. Kemper Corp.*, 949 F.Supp. 1341, 1352 (N.D.Ill. 1997), *aff'd*, 133 F.3d 999 (7th Cir. 1998); *Cora v. Rancilio Macchine Per Caffe*, No. 01 C 3613, 2003 WL 21654152 at **4-6 (N.D.Ill. July 14, 2003).

Even as to management, his arguments are legally and factually infirm. Legally, his arguments, and the cases he cites, deal mainly with the estoppel version of "implied waiver," a theory discussed below. Factually, if he is arguing that management truly intended to waive the

Board-approval condition, the argument is hopeless. Drs. Goodman and Krishnan testified they never viewed the 2016 Letter as in effect, since the Board had rejected it. DX 2, 246:24-247:6; DX 11, 44:18-19. There was no reason to doubt them. Sane executives don't defy their Boards, particularly on matters they know to be important, which Board approval of pricey physician contracts is. See above at 4.

His arguments for nonetheless finding a management intent to waive fail at the outset, because he does not argue that any management act was "clear, unequivocal and decisive" and consistent *only* with an intent to waive. To the contrary, he argues that this high burden of proof only applies if the contract in question has a no-waiver clause. PB 27. No case supports this argument. Most cases imposing this burden have nothing to do with no-waiver clauses. *See, e.g., Sphere Drake*, at 679; *Anderson v. Cath. Bishop of Chicago*, 759 F.3d 645, 651 (7th Cir. 2014).

No reasonable jury could find that the management acts he cites meet the "clear, unequivocal and decisive" standard. To the contrary, every such act is easily explained without the oxymoronic notion that

management intended to overrule the Board and let the rejected 2016 Letter take effect.

First, he argues that Rush "continued to perform under the 2016 Letter Agreement" and that consequently a jury "could conclude" that Rush regarded the 2016 Agreement as being in effect. PB 31. "Could conclude" isn't enough, as discussed above. Only "had to conclude" meets the standard of proof. Moreover, he confuses the 2016 Agreement, which the Board rejected, with *the 2016 Agreement as amended by the June 2017 amendment,* which the Board approved but *he* rejected. The 2017 amendment incorporated the terms of the 2016 Agreement but added a productivity requirement for him. Had he signed, he would have had a multi-year contract consisting of the 2016 Agreement as amended by the 2017 amendment. But since he rejected the amendment, that left only the 2016 Agreement the Board had rejected, so he had no letter agreement at all.

For this reason, it is false that Dr. Krishnan "admitted he ensured that Rush performed the terms of the 2016 Letter Agreement" (PB 11), that "Rush's adherence to the terms of the 2016 Letter Agreement is not in dispute" (PB 26), and that the parties were "performing all of their

obligations under the 2016 Letter Agreement" (*id.*).  The agreement Dr.

Krishnan thought he was "performing under" or "adhering to" wasn't

the Committee-rejected 2016 Letter Agreement.  It was the 2016 Letter

Agreement as amended by the June 2017 amendment that the Board

approved and that he thought Dr. Jokich had signed.  Thus, as the court

held, no reasonable jury could find that continuing to pay the bonus and

enhanced benefits to him and his Division physicians was consistent

*only* with the 2016 Letter, standing alone, being in effect.  App. A-36-37.

Moreover, continuing to pay enhanced benefits and bonuses to

Division members didn't compel the conclusion that *any* letter

agreement was in effect.  Rush had paid them before any letter

agreement with Dr. Jokich required them; paid them in 2013-14 when

no letter agreement was in effect; and paid them after Dr. Jokich left

Rush.  See above at 4-5, 7.

Second, he cites statements to Johnson in June 2018 by Dr.

Goodman and Carl Bergetz, Rush's general counsel, that he was

employed under a "multi-year agreement."  PB 32.  However, it is

undisputed that they were referring to the *amended* agreement, which,

like Dr. Krishnan, they mistakenly thought Dr. Jokich had signed.  As

Dr. Jokich himself says, Bergetz referred to "8/12/16 Letter Agreement, *as modified by Board."* PB 12 (emphasis added).

Third, Dr. Jokich cites the draft termination letter Rush's outside counsel sent for consideration by Rush management on June 6, 2018. See above at 14. That letter assumed he had a four-year agreement, and Dr. Jokich says it therefore shows that Rush thought the 2016 Letter was in effect. PB 32-33. But as the district court held, "This is fully consistent with Rush's position that management believed Jokich had signed the amended offer letter." App. A-37, n. 14.

The draft letter was also inadmissible. That it was written by Rush's attorney did not make it admissible under F.R.Ev. 801(d) as an "opposing party's statement." "[T]he unique nature of the attorney-client relationship…demands that a trial court exercise caution in admitting statements that are the product of this [attorney-client] relationship." *U.S. v. Harris*, 914 F.2d 927, 930-31 (7th Cir. 1990). "[T]he free use of prior [statements] may deter counsel from vigorous and legitimate advocacy'" and hence "a more exacting standard must be demanded for admission of statements by attorneys under Rule 801(d)(2)(D)." *Id.* (citation omitted); *see also U.S. v. Sanders*, 979 F.2d

87, 92 (7th Cir. 1992), *cert. denied,* 508 U.S. 920 (1993) (such evidence "should be offered [only] in rare cases and where absolutely necessary"). This was a *draft* letter, sent only to the client to see whether the proposed presentation of the client's position was accurate and acceptable. *See Candle Corp. v. Boole & Babbage, Inc.*, 1985 WL 1087794 (C.D.Cal. Aug. 2, 1985), denying admission under Rule 801(d) of an unsigned draft complaint and a letter from the drafting attorney asking for comments. *Id.* at **5-6.

Fourth, he cites the 2017 episode of Dr. Grabler's bonus. Angry with her for persuading Rush Oak Park Hospital to acquire 3D Tomosynthesis, he demurred when the Dean's office asked him, as Division Director, to approve her annual bonus. See above at 8. He argues that the Dean's Office would not have "reached out" to him if it hadn't thought the 2016 Letter was in place and hence she was entitled to it. PB 30-31. This makes no sense. If anything, asking him whether he supported her bonus suggested there was *no* contractual obligation to pay her a bonus, or Rush wouldn't have asked him. Anyway, as stated earlier, Rush had paid these physicians bonuses before any letter

agreement required them, and continued to pay them after Dr. Jokich left Rush.

Beyond the above arguments, Dr. Jokich tosses in a few more.

1.  He argues that waiver is generally a question of fact. PB 25. But "[t]he determination of whether facts are sufficient to constitute waiver is a question of law." *Munoz v. Expedited Freight Sys., Inc.,* No. 89 C 3700, 1990 WL 114589, at *4 (N.D.Ill. July 23, 1990), *citing Whalen v. K-Mart Corp.,* 519 N.E.2d 991, 994 (Ill. App. 1988). Myriad cases grant summary judgment after undisputed facts showed no implied waiver of a condition precedent. *See, e.g., Taylor v. JP Morgan Chase Bank, N.A.,* 958 F.3d 556, 565 (7th Cir. 2020); *Allen v. Cedar Real Estate Grp.,* 236 F.3d 374, 382-83 (7th Cir. 2001).

2.  He argues: "Waiver via conduct is judged from the eyes of the party, perceiving the consequences of the conduct as it concerns waiver, i.e., Appellant." PB 26. For this non-rule of law, he cites *Sosin v. Hayes*, 630 N.E.2d 969 (Ill. App. 1994), which had nothing to do with waiver. How the other party "perceived" the conduct is irrelevant to whether the conduct clearly and decisively shows intent to waive by the allegedly waiving party.

3.     He cites cases holding that implied waiver may arise where "the conduct of one party has misled the other party into a reasonable belief that a waiver has occurred."  PB 27, *citing Dearborn Industrial Manufacturing Co., Ltd. v. Soudronic Finanz AG*, No. 95 C 4414, 1996 WL 467245, at *3 (N.D.Ill. Aug. 13, 1996).  *Dearborn* uses "implied waiver" to describe estoppel, not intentional waiver.  And as discussed below under the estoppel issue, no reasonable jury could find Rush misled Dr. Jokich about anything.

4.     He argues that Rush should have known he hadn't signed the amendment, and says that where a party "should have known through reasonable diligence that the condition was not met, the party may be charged with a knowing waiver of the condition."  PB 28, *quoting Watson v. Champion Computer Corp.*, No. 99 C 1639, 2000 WL 1741882 (N.D.Ill. Nov. 22, 2000).  The "condition" here was Board approval of the 2016 Letter, not whether he signed the amendment. Rush's tardiness in realizing he hadn't signed the 2017 amendment is irrelevant, because he expressly disdains relying on that amendment. Anyway, he cannot fault Rush for being slow to realize what he deliberately did not tell it.

*Watson* does not help him.  There an employee, fired after eight and a half months, alleged she had a three-year contract.  The employer argued that her offer letter had required her to sign a noncompetition form, which she didn't do.  Since the employer did nothing before firing her to verify if she had signed the form, the court found an issue of fact as to whether it intended to waive that condition precedent prior to firing her.  *Watson,* at **3-4.  Here, a year *before* Rush removed Dr. Jokich, it gave him the chance to cure the undisputed failure of the 2016 Letter's condition precedent by signing the 2017 amendment.

5.    He notes that Rush waited five months before sending him an amendment after the Committee rejected the 2016 Letter (PB 8), but develops no argument based on this fact.  It is undisputed that from March 2017 forward he knew of the failure of the Board-approval condition.  *Sphere Drake* held that an *eight*-month delay in repudiating a contract was insufficient evidence to indicate an intent to waive a condition precedent.  376 F.3d at 677-79.

## 2.    The "estoppel" theory failed.

Equitable estoppel arises "when a party, by his words or conduct, intentionally or through culpable negligence, induces reasonable

reliance by another on his representations and thus leads the other, as a result of that reliance, to change his position to his injury. While an intent to mislead is not necessary, the reliance by the other party must be reasonable." *Schwinder v. Austin Bank of Chi.*, 809 N.E.2d 180, 191-92 (Ill. App. 2004).

As the district court rightly held, there was no evidence of a misrepresentation in connection with the 2016 Letter. App. A-37. Rush repeatedly told him the Committee had *disapproved* that Letter. DX 90, 91; PR ¶¶26, 27. No one told him the Board or management considered the 2016 Letter binding. Until he sued, he never told Rush *he* thought it was binding.

Dr. Jokich argues the court erred by not considering "Rush's performance of the terms of the 2016 Letter Agreement" as evidence from which a jury could have found conduct equivalent to a misrepresentation. PB 37. As before, he conflates the 2016 Letter, which he knew had been disapproved, with the *amended* 2016 Letter, which he rejected. See above at 50-51.

He also failed the "reasonable reliance" requirement for estoppel as a matter of law, although the district court found no need to consider

that requirement. He claims he would have left Rush if anyone had told him that the 2016 Letter was not in effect. PX A, ¶9; PB 38. No reasonable jury could accept this *ex post facto* claim, given the undisputed facts of what he knew and did. He was told the Committee had rejected the 2016 Letter. He acknowledged the Committee had to approve an amended letter agreement. He was sent the amended agreement the Committee did approve. Knowing all this, he didn't sign the amendment, told nobody, and *stayed at Rush.* See above at 6-7. This undisputed conduct wasn't reliance on anything. It was trying to have his cake and eat it too. He refused to sign the amendment because he objected to its productivity standard, but when he was removed, he claimed the right to the four-year term he would have had by signing. In short, Dr. Jokich is trying to use estoppel to enforce one term of an agreement he refused to make.

Had he really believed the 2016 Letter was in effect, his belief would have been unreasonable as a matter of law. In *Glass v. Kemper Corp., supra,* because the plaintiff was told in writing that the employment terms would require board approval, the court found it *per se* unreasonable for him to believe that a manager "had ultimate

authority to enter into a binding employment agreement with him."
949 F.Supp. at 1349-50.  This is the rule everywhere. "When a third
party has notice that approval by the corporation's board of directors is
requisite to bind the corporation to a transaction of a particular type, it
is not reasonable for the third party to believe that the president or
chief executive officer (CEO) may bind the corporation through
unilateral action."  Restatement (Third) of Agency §3.03 cmt. e (2006).

### B. No reasonable jury could find that putting Dr. Jokich on paid leave was a "termination" of his FEA.

On appeal, Dr. Jokich has abandoned all but one of his claims of
violation of his Faculty Employment Agreement.  See above at 45 n.5.
He continues to argue that the FEA allows a "termination" during a
term only for specified cause, that Rush has never asserted such cause,
and that the jury should have been permitted to decide whether what
Rush did before the FEA's expiration "terminated" him or merely
"demoted" him.  PB 39-40.

This claim is an argument over labels, not a dispute of fact.  It is
irrelevant whether removing him as Division Director and putting him
on paid leave is labeled a "termination," a "demotion," or something
else, because the word "termination" in the FEA refers only to

*termination of the FEA itself.* Section 3.2 of the FEA's Terms and Conditions reads: "Rush will have the right *to terminate this Agreement* immediately by giving written notice to Faculty Member or Faculty Member's designee, upon the occurrence of any of the following events…." (Emphasis added.) Changing Dr. Jokich's salary or duties did *not* terminate the FEA itself. To the contrary, FEA §7 allows such changes during any one-year term. Nor was putting him on paid administrative leave a termination of the FEA itself. The district court ruled that the FEA did not prohibit that action (D.E. 40, at 14), and his brief does not challenge that ruling.

Dr. Jokich argues that "termination" is "ambiguous," giving the jury the right to decide whether Rush's actions deserve the label of "termination." PB 40-41. Not so. The words "terminate this Agreement" unambiguously mean that a party tells the other, "This Agreement is over," and treats it as over. No one contends Rush did that. When Rush removed Dr. Jokich as Division Director and put him on paid leave, it did not terminate the FEA itself. Nor did he. He continued while on leave to accept the salary and benefits required by the FEA for the remainder of its term.

## C. The court rightly granted summary judgment on the Bylaws §10.3-2(c) claim.

On appeal, Dr. Jokich has abandoned all claims of violation of the Medical Staff Bylaws with one exception: he still invokes Bylaws §10.3-2(c). Entitled "Term of Office," it reads: "A division…director shall be appointed and shall serve solely at the discretion of the Department Chairperson." He argues that Rush violated this Bylaw because Dr. DeCresce rather than Dr. Byrd made the decision to remove him. PB 41-43. The district court rejected this claim, because the undisputed facts made clear that "Dr. Byrd exercised her discretion to allow Jokich's removal." App. A-40. Her testimony made clear she had nothing to do with his running his Division. As he put it, Dr. Goodman from the start gave him "*carte blanche* authority" to run his Division as he pleased. D.E. 150, ¶45. Dr. Byrd regarded his supervisors as being Dr. DeCresce and Dr. Krishnan. She didn't expect to choose his replacement. She didn't object when he was removed. See above at 16.

Dr. Jokich interprets the Bylaw to mean that the idea to remove him must *originate* with Dr. Byrd, so that his removal is forbidden even if the person she regarded as his real boss wanted him gone, Rush's top executives agreed, and she had no objection. That interpretation would

impermissibly produce "absurd results."  *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002).

Dr. Jokich argues that there is an "issue of fact" about who made the decision, and that if Dr. DeCresce made it, then Dr. Byrd did not "exercise her discretion" to allow Dr. Jokich's removal.  PB 42.  This argument willfully misconstrues the court's holding.  All the court meant was that if anyone had a right under this Bylaw, it was Dr. Byrd, and she had no interest in using any such right to prevent his removal.  There was no "issue of fact" of who the decisionmaker was -- it was indisputably Dr. DeCresce.  He told Dr. Byrd upon her returning from vacation that Dr. Jokich was gone.  Dr. Jokich sued that week, alleging his Bylaw theory among others.  Yet Dr. Byrd did not object to his removal, then or thereafter.

Dr. Jokich also argues that "[a] reasonable jury could also conclude that Dr. Byrd did not approve of (or disapprove of) the decision, which had already been made, thereby divesting her of the sole contractual authority to determine whether a Division head should be removed."  PB 43.  It is irrelevant whether Dr. Byrd "approved of,"

"disapproved of," or was indifferent to Dr. DeCresce's decision. All that matters is whether she objected to it. She didn't.

For the above reasons, the three state claims Dr. Jokich has not abandoned rightly lost on summary judgment.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

/s/ George F. Galland, Jr.
One of the Attorneys for Appellee
Rush University Medical Center

George F. Galland, Jr.
ggalland@lawmbg.com
Roisin Duffy-Gideon
rduffy@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
(312) 751-1170

Dated: December 16, 2021

CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 12,769 words, excluding the parts of the document exempted by Fed.R.App.P. 32(f).

This document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 14-point Century font.

Dated: December 16, 2021

/s/ George F. Galland, Jr.
George F. Galland, Jr.
Counsel of Record for Appellee